IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-02162-PAB-SKC

JASON BROOKS,

      Plaintiff,

v.

TERESA REYNOLDS,
DONALD CANFIELD,
JEFF LONG,
DEAN WILLIAMS,
JOHN DOE, Colorado Department of Public Health & Environment, and
COLORADO SUPREME COURT,

      Defendants.

_____

**ORDER**
_____

      This matter is before the Court on the Recommendation re: Motion to Dismiss

[#40] [Docket No. 74] filed in August 18, 2021.  The recommendation addresses

plaintiff's amended complaint, Docket No. 34, and recommends granting the motion to

dismiss, Docket No. 40, filed by defendants Teresa Reynolds ("Reynolds"), Donald

Canfield ("Canfield"), Jeff Long ("Long"), and Dean Williams ("Williams") (collectively,

the "CDOC defendants")[1] pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).  Docket No. 74 at 20.  Plaintiff filed written objections to the recommendation.

Docket No. 80.  The CDOC defendants responded to plaintiff's objections.  Docket No.

_____

      [1] The motion is also filed on behalf of defendant Nataliya Nickels.  *See id.* at 1
n.1.  Plaintiff, however, confirmed that he intended to remove Nickels as a defendant,
*see* Docket No. 57 at 1 n.1, and she is not listed as a defendant in plaintiff's Verified
First Amended Complaint.  *See* Docket No. 34 at 2–4.

81.  Plaintiff replied.  Docket No. 82.  Because plaintiff is *pro se*, the Court construes his filings liberally without serving as his advocate.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[2]

Plaintiff is a parolee in the custody of the Colorado Department of Corrections ("CDOC"), Docket No. 75 at 1, ¶ 1, and was previously held at Sterling Correctional Facility ("Sterling").  Docket No. 34 at 5, ¶ 2.  After plaintiff was moved to Sterling, Reynolds and Canfield subjected plaintiff to harassment and retaliation for filing lawsuits and grievances and hindered his access to the courts by depriving him of law library resources.  *Id.*, ¶¶ 2–5.  Plaintiff states that a CDOC policy, "AR750-01F(II)(A)(d),"[3] gives inmates working on habeas corpus or statute of limitation deadlines priority access to the library.  *Id.*, ¶ 3.  Despite this policy, however, Reynolds and Canfield intentionally deprived plaintiff of access to the law library.  *Id.*, ¶ 4.  In response, plaintiff filed a grievance.  *Id.*, ¶ 5.  Canfield responded to the grievance by stating that "giving potential priority is not a mandate" but rather a consideration.  *Id.*  When plaintiff alerted Reynolds that Canfield had not followed CDOC policy concerning access to the library, Reynolds did nothing.  *Id.* at 6, ¶ 6.  In response to another complaint, Reynolds told plaintiff that the only supplies or assistance CDOC has to provide is 20 blank sheets of paper per month.  *Id.* at 11, ¶ 30.

_____

[2] The following facts, which the Court assumes to be true, *see Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011), are taken from plaintiff's amended complaint.  Docket No. 34.

[3] Plaintiff did not include a copy of this policy with his complaint.

Canfield also kept a log of plaintiff's conduct while in the library because plaintiff "has often grieved staff and he leaves out all the specific details as to the actual events"; plaintiff claims this monitoring was in retaliation for plaintiff's grievances and was meant to deter plaintiff from helping his friends and to justify later deleting plaintiff's "legal work-product." *Id.* at 6, ¶¶ 7–8.

Canfield and Reynolds closed the law library under the "illusory veil" of reducing the risk of COVID-19 in the prison complex and inmate population. *Id.*, ¶ 9; *id.* at 7, ¶ 11–12. Had the library not been closed, plaintiff alleges he would have had his conviction vacated prior to the COVID-19 outbreak, which, plaintiff states, is the "crux" of his retaliation claim. *Id.*, ¶ 11. Plaintiff contends that the law librarians could have worked from their separate, closed offices while inmates were in the library and that inmates could have visited the library by the cohort that they live in, which would have minimized virus transmission risks. *Id.*, ¶ 13. Instead, inmates had to request materials via the prison mail system and have their materials delivered unit-by-unit by librarians, which put the librarians at greater risk. *Id.* at 6–7, ¶ 14. Plaintiff believes that the decision to close the library altogether was "not only illusory, but it [was] negligent at best and deliberately indifferent on its face," *id.*, and that the new procedures, having materials delivered, are "unconstitutional, inadequate, and obstructive" because they are procedures that are supposed to be used only for inmates in "segregation." *Id.* at 7, ¶¶ 15–16. When plaintiff filed his amended complaint, inmates were required to request legal cases by providing the specific case citation, which plaintiff believes meant that they could not conduct research adequately. *Id.*, ¶¶ 16–17. The closure of

the library also meant that plaintiff could not retrieve the "thousands of hours of created legal work product" that he had drafted, which remains stored on library computers, and that plaintiff was not able to work on his criminal case.  *Id.*, ¶ 18.

Plaintiff also states that keeping the law library at the highest level of the COVID-19 safety protocols results in employees receiving $50 per day in hazard pay, meaning that defendants had a financial incentive to keep the library closed.  *Id.* at 14, ¶ 49.  To ensure that they keep receiving hazard pay, plaintiff alleges that Williams intentionally failed to implement a mandate that correctional staff be vaccinated against COVID-19, which results in frequent re-introduction of the virus in the staff population and requires heightened COVID-19 safety protocols.  *Id.* at 15, ¶ 53.

Inmates were also required to make photocopy requests using the "inter-facility mail" system, which is unrestricted and consequently breaches the inmates' confidentiality.  *Id.* 8–9, ¶¶ 18–19.  This procedure resulted in plaintiff's materials disappearing or being destroyed.  *Id.*  Additionally, in one case, because he could not obtain photocopies on time, plaintiff was unable to comply with service requirements in a Colorado Supreme Court case and, in other cases, he received a notice of deficiency, which caused plaintiff actual injury.  *Id.* at 9, ¶¶ 20–21.

Because he had no physical access to the law library, plaintiff was forced to use a friend's typewriter to draft documents, but struggled to timely purchase typewriter ribbons and found that he could not handwrite his briefs on time and within page limits.  *Id.* at 9–10, ¶¶ 22–25, 28.  Without library access, plaintiff also could not comply with Colorado Appellate Rules because he did not have access to the court record for

4

citations, which disadvantaged him.  *Id.* at 10, ¶ 26.

In late 2020, after Canfield retired or quit, Sterling changed its library access policies and gave high-security inmates more access to the library than low-security inmates, one hour per weekday compared to one hour per week.  *Id.* at 11–12, ¶¶ 32–34.  Ultimately, the discrepancy resulted in high-security inmates receiving 28 hours of physical law library access while plaintiff only received three hours before Sterling closed the low-security law library again.  *Id.* at 12, ¶ 35.  Because plaintiff was delayed in seeking habeas corpus relief, he believes that he faced the "unconstitutional suspension" of his right to habeas corpus, and he was unable to properly support his claim to get his conviction vacated.  *Id.* 12–13, ¶¶ 38–40.  He was also unable to conduct adequate research in order to decide whether to accept a settlement offer in another case, *id.* at 13, ¶ 43, and was "precluded" from filing seven additional lawsuits which could have resulted in millions of dollars in damages.  *Id.* at 17, ¶ 62.

Plaintiff originally brought six claims for relief – (1) First Amendment retaliation, (2) "violation of court access," (3) "violation of due process," (4) "violation of equal protection," (5) "unconstitutional suspension of writ of habeas corpus," (6) "violation of Eighth Amendment," *id.* at 20–28, ¶¶ 80–129 – and sought damages and injunctive relief, including an order requiring CDOC staff to be vaccinated and create a tracking policy so that inmates could monitor and avoid unvaccinated employees.  *Id.* at 27–28, ¶¶ 128–29.  As a result of plaintiff's release from custody, he concedes that all but his First Amendment retaliation and access-to-courts claims are moot.  Docket No. 80 at 14.

5

The CDOC defendants move to dismiss plaintiff's claims against them in their entirety pursuant to Rule 12(b)(1) and Rule 12(b)(6).  *See* Docket No. 40.[4]  The CDOC defendants argue that plaintiff fails to state a retaliation or access-to-courts claim under the First Amendment.  *Id.* at 6–14.  The CDOC defendants also argue that they are entitled to qualified immunity with respect to plaintiff's claims against them in their individual capacities.  *Id.* at 23–24.[5]

Magistrate Judge Crews recommends that the CDOC defendants' motion to dismiss be granted.  *See* Docket No. 74.  Plaintiff has filed objections to the recommendation.  *See* Docket No. 80.

## II. LEGAL STANDARD

The Court must "determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  An objection is "proper" if it is both timely and specific.  *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996).  A specific objection "enables the district judge to focus attention on those issues – factual and legal – that are at the heart of the parties' dispute."  *Id.*

In the absence of an objection, the district court may review a magistrate judge's recommendation under any standard it deems appropriate.  *See Summers v. Utah*, 927

---

[4] The Colorado Supreme Court has filed a separate motion to dismiss, *see* Docket No. 67, which will be addressed in a subsequent recommendation.

[5] Because plaintiff has conceded that his other claims are moot, the Court will not consider the CDOC defendants' additional arguments.  The Court notes, however, that while the CDOC defendants argue that the Eleventh Amendment bars plaintiff from seeking monetary relief against them in their official capacities, *see* Docket No. 40 at 4–5, plaintiff does not seek monetary damages from the CDOC defendants in their official capacities.  *See* Docket No. 34 at 5, ¶ 1.

F.2d 1165, 1167 (10th Cir. 1991); *see also Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."). The Court therefore reviews the non-objected to portions of the recommendation to confirm that there is "no clear error on the face of the record." Fed. R. Civ. P. 72(b), Advisory Committee Notes. This standard of review is something less than a "clearly erroneous or contrary to law" standard of review, Fed. R. Civ. P. 72(a), which in turn is less than a de novo review. Fed. R. Civ. P. 72(b). Because plaintiff is proceeding *pro se*, the Court will construe his objections and pleadings liberally without serving as his advocate. *See Hall*, 935 F.2d at 1110.

### A.  Lack of Subject Matter Jurisdiction

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint. Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). When resolving a facial attack on the allegations of subject matter jurisdiction, the Court "must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). To the extent a defendant attacks the factual basis for

subject matter jurisdiction, the Court "may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *SK Finance SA v. La Plata County*, 126 F.3d 1272, 1275 (10th Cir. 1997). "Reference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment in such circumstances." *Id.* Ultimately, and in either case, plaintiff has "[t]he burden of establishing subject matter jurisdiction" because she is "the party asserting jurisdiction." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir.2008).

### B.  Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). However, a plaintiff still must provide "supporting factual averments" with his allegations. *Cory v. Allstate Insurance*, 584 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual

averments are insufficient to state a claim on which relief can be based." (citation omitted)); *see also Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002) (stating that a court "need not accept [] conclusory allegations"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

### C.  Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court should resolve questions of qualified immunity at the earliest possible stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). However, a plaintiff facing a qualified

immunity challenge still does not have a heightened pleading standard. *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

## III. ANALYSIS

### A. Mootness

The magistrate judge recommends granting the CDOC defendants' motion in

part because plaintiff's release from Sterling has rendered some of his claims moot.[6]

Docket No. 74 at 6–7.  In particular, the magistrate judge found moot plaintiff's requests

for declaratory and injunctive relief concerning library access and scheduling, as well as

his request that all CDOC employees be vaccinated and that CDOC create a tracking

policy so that inmates may be aware when an unvaccinated employee has entered the

inmate living quarters.  *Id.* (citing *Kan. Jud. Review v. Stout*, 562 F.3d 1240, 1246 (10th

Cir. 2009) ("In deciding whether a case is moot, the crucial question is whether granting

a present determination of the issues offered will have some effect in the real world.

When it becomes impossible for a court to grant effective relief, a live controversy

ceases to exist, and the case becomes moot." (citation and alteration omitted)); *Green

v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997) (once prisoner was released from the

prison system, neither declaratory nor injunctive relief would have any effect on

defendants' behavior)).

      Plaintiff "concedes that any injunctive relief related to his confinement is moot."

Docket No. 80 at 1, 9.  The Court agrees and will dismiss plaintiff's requests for

declaratory and injunctive relief concerning library access and scheduling, as well as his

requests that CDOC require employees to be vaccinated against COVID-19 and that

CDOC provide inmates a tracking tool to monitor unvaccinated CDOC employees.

Plaintiff also states that, aside from his First Amendment retaliation and access-to-

---

[6] Although the CDOC defendants did not raise this argument in their motion to dismiss, as plaintiff had not been released from Sterling when they filed their motion, the magistrate judge considered mootness *sua sponte*.  *See McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996) ("Because mootness is a matter of jurisdiction, a court may raise the issue *sua sponte*." (citing *Johnson v. Riveland*, 855 F.2d 1477, 1480 (10th Cir. 1988)).

courts claims, he "no longer wishes to pursue" his remaining claims.  *Id.* at 14.

### B.  First Amendment Retaliation

In his First Amendment retaliation claim, plaintiff alleges that defendants "deliberately violated CDOC policy" in order to "intentionally impede, hinder, deter, and obstruct" plaintiff's access to the courts and that these actions were meant to intimidate plaintiff.  Docket No. 34 at 20, ¶ 81.  He also alleges that defendants knew that plaintiff was engaged in litigation and that impeding his library sessions would "actually harm" plaintiff by preventing him from filing lawsuits against defendants.  *Id.*, ¶ 82.  Had defendants not violated CDC policy, plaintiff states that he "would have been out of prison before the pandemic even began."  *Id.*, ¶ 84.

Generally, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks omitted).  To establish a First Amendment retaliation claim, plaintiff must demonstrate (1) that he was engaged in a constitutionally protected activity; (2) that the defendant's action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's action was substantially motivated as a response to his exercise of his First Amendment speech rights.  *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007).

The magistrate judge recommends that plaintiff's First Amendment retaliation claim be dismissed.  Docket No. 74 at 8–10.  Although it is well-established that prison officials may not retaliate against an inmate because of the inmate's exercise of his

rights of access to the courts, the magistrate judge found plaintiff's allegations of injury not sufficiently specific as to when he requested additional time in the library, the details of defendants' denial of those requests, and what plaintiff wold have been able to accomplish if he had greater library access. *Id.* at 9. The magistrate judge characterized plaintiff's allegations as "simply . . . a complaint that he didn't receive the hours he wanted." *Id.* Additionally, the magistrate judge found plaintiff's allegations conclusory because he offered no supporting factual allegations for his claim that, but for the CDOC defendants' conduct, his criminal sentence would have been vacated and he would have been released from prison prior to the COVID-19 pandemic. *Id.* at 9–10. Plaintiff raises a number of objections to the magistrate judge's recommendation. The Court considers them in turn.

First, plaintiff asserts that he alleged "specific facts of retaliation, asserting that had he not engaged in filing grievances and lawsuits while exercising his First Amendment rights, he would not have suffered retaliation by [d]efendants Canfield and Reynolds." Docket No. 80 at 10 (citing Docket No. 34 at 5–7, ¶¶ 2–12; *id.* at 20, ¶¶ 80–85).

The Court agrees with the magistrate judge that plaintiff's allegations are insufficient to plausibly allege a First Amendment retaliation claim because plaintiff has not shown that defendants caused plaintiff suffer an injury that would chill an ordinary person from continuing to exercise his First Amendment rights. Plaintiff's allegations appear to be that, after he was transferred to Sterling and submitted grievances against the CDOC defendants, including one on July 24, 2018, defendants retaliated against him by violating CDOC policy that provides inmates working on habeas corpus petitions

13

priority access to the law library and also by tracking his actions in the library.  Docket No. 34 at 5–7, ¶¶ 2–10.  Plaintiff asserts that, had defendants not retaliated against him, he would have had his conviction vacated and been released before the COVID-19 outbreak.  *Id.* at 7, ¶ 11.  He further alleges that, if defendants were worried about COVID-19, they would not have limited access to the library as they did.  *Id.* at 7, ¶¶ 11–12.  Plaintiff alleges that the CDOC defendants' actions have hindered his ability to file lawsuits "directed at them."  *Id.* at 20, ¶¶ 81–83.

Aside from the single July 24, 2018 grievance, plaintiff has not pled any specific allegations that would permit the Court to conclude that he faced retaliation for engaging in protected activity.  To the contrary, most of plaintiff's concerns with the law library appear to be based in his opinion that Sterling's COVID-19 mitigation protocols were not efficient or equally applied to low-security inmates or that the protocols could have been more effective if done differently.  As the magistrate judge noted, this is not sufficient to establish a constitutional violation.  *See Grinis v. Spaulding*, 459 F. Supp. 3d 289, 292 (D. Mass. 2020) ("These affirmative steps may or may not be the best possible response to the threat of COVID-19 within the institution, but they undermine an argument that the respondents have been actionably deliberately indifferent to the health risks of inmates."); *see also Perkins v. Kan. Dept. of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (a prisoner's disagreement with medical personnel over the course of his treatment does not make out a cause of action under the Eighth Amendment).

Moreover, while plaintiff's July 24, 2018 grievance is more specific than his other allegations, it does not establish a plausible First Amendment retaliation claim because, even if CDOC did not follow its own library access policy, a defendant's violation of a

14

policy is not, without more, a constitutional violation.  *See, e.g.*, *Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995) ("[V]iolation of a police department regulation is insufficient for liability under section 1983.").

While plaintiff has identified a case where the court held that a prison employee's conduct in violation of prison policy was a constitutional violation, *see* Docket No. 80 at 10 (citing *Simkins v. Bruce*, 406 F.3d 1239, 1242–43 (10th Cir. 2005)), the Tenth Circuit in that case did not set forth a rule that violation of a prison policy is, by itself, a violation of the Constitution.  In *Simkins*, the court held that it was a First Amendment access-to-courts violation for a prison mail-room employee to hold an inmate's legal mail and that the violation was deliberate because it was in contravention of prison policy that the employee referenced and knew about.  406 F.3d at 1242–43. In this case, plaintiff has failed to plausibly allege that the CDOC defendants' failure to schedule him for what he considered adequate library time was a constitutional violation, given that there is "no right in the Constitution to unfettered use of a prison library," *see Lewis v. Clark*, 663 F. App'x. 697, 700 (10th Cir. 2016) (unpublished) (citing *Penrod v. Zavaras*, 94 F.3d 1399, 1403 (10th Cir. 1996)), and "inmates do not have the right to select the method by which access [to courts] will be provided." *Penrod*, 94 F.3d at 1403 (citing *Ramos v. Lamm*, 639 F.2d 559, 583 (10th Cir. 1980)).  Plaintiff, therefore, has not established that defendants' failure to allow him the time in the law

library that he wished or believed he was entitled to amounted to First Amendment retaliation.

Second, plaintiff states that he provided the Court with proof of his specific retaliation allegations and the date that he made his request that Canfield schedule him in accordance with the CDOC policy.  Docket No. 80 at 10 (citing Docket No. 57 at 19). He also states that Canfield denied this request in contravention of CDOC policy that inmates working on habeas cases are to be given scheduling priority.  *Id.* (citing Docket No. 57 at 19).  Plaintiff states that he alleged that defendants retaliated against him by "intentionally misinterpreting [CDOC policy] in order to specifically deprive [plaintiff] of law library access he was entitled to in order to *frustrate and impeded* [sic] his access to courts."  *Id.*  This objection appears to concern the same July 24, 2018 grievance that the Court considered above, as the response references an informal grievance with that date.

Plaintiff also cites to additional allegations contained in his response to defendants' motion to dismiss.  *Id.*  The Court, however, will not consider an argument raised for the first time in a plaintiff's response because a motion to dismiss tests the sufficiency of allegations in a complaint, not the plaintiff's response.  *See, e.g.*, *Shepherd v. U.S. Olympic Comm.*, 464 F. Supp. 2d 1072, 1089 (D. Colo. 2006)*, aff'd sub nom. Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191 (10th Cir. 2008); *Est. of Goodwin v. Connell*, 376 F. Supp. 3d 1133, 1144 (D. Colo. 2019) ("a motion under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint"); *Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015) (a plaintiff cannot amend

his complaint through a response to a motion to dismiss (citing *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995))).  Moreover, the Tenth Circuit has made clear that, where "a qualified immunity defense is asserted in a 12(b)(6) motion, . . . we apply a heightened pleading standard, requiring the complaint to contain 'specific, non-conclusory allegations of fact sufficient to allow the district court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of clearly established law.'"  *Dill v. City of Edmond*, 155 F.3d 1193, 1204 (10th Cir. 1998) (quoting *Breidenbach v. Bolish*, 126 F.3d 1288, 1293 (10th Cir. 1997)).

Third, plaintiff states that there is a "clear nexus" between [defendants'] conduct and the retaliation" because Canfield admitted to tracking plaintiff's activity in the law library due to plaintiff filing grievances against staff members.  Docket No. 80 at 11. While plaintiff subsequently objects that the magistrate judge erred in "suggesting [that] an injury needs to flow from retaliation," he asserts that, "but for" the retaliatory motive of the CDOC defendants, he would not have been impeded from engaging in a constitutionally protected activity, i.e., pursuing his habeas claims.  *Id.*

To the extent plaintiff claims that he does not need to plead causation in order to establish a First Amendment retaliation claim, he is mistaken.  As both the Court and magistrate judge have noted, a First Amendment retaliation claim requires showing, among other things, that the defendant's action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. *See Becker*, 494 F.3d at 925; Docket No. 74 at 8 (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).  Although plaintiff states in his objections that he has

17

shown a "clear nexus," the Court disagrees.  Plaintiff has not shown to whom he complained, when he complained, what the precise response was, besides one response to his July 24, 2018 complaint, or how the determination or response amounted to a constitutional violation.  He therefore has not plausibly stated a claim. *See Frazier v. Dubois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990) ("Mere allegations of constitutional retaliation will not suffice; plaintiffs must rather allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights."). Even if plaintiff could use his response to defendants' motion to allege a First Amendment retaliation claim, plaintiff's response provides no additional details.  *See* Docket No. 57.  Attached to that response, plaintiff has provided defendants' response to his July 24, 2018 grievance, not his grievance itself.  Plaintiff has not shown how many inmates had similarly pressing deadlines and legal concerns or that plaintiff did not seek to be scheduled for multiple sessions in the library to the exclusion of other inmates with similarly pressing needs.  Thus, even if plaintiff is correct that the policy states that "inmates working on habeas corpus and/or statute of limitations deadlines WILL be given priority for scheduling purposes," Docket No. 34 at 5, ¶ 3, plaintiff has not alleged that he was excluded from the library in favor of inmates without habeas corpus or statue of limitations deadlines or that the policy provides a guarantee, over another inmate with a pressing need, for a particular session.  Plaintiff has also not plausibly alleged that "defendants' alleged retaliatory motives were the 'but for' cause of the defendants' actions."  *See Peterson v. Shanks*, 149 F.3d 1140, 1144–45 (10th Cir. 1998).  He has therefore not plausibly alleged a constitutional violation, and the Court finds that the CDOC defendants are entitled to qualified immunity.  *See T.D.*, 868 F.3d

18

at 1220 (a plaintiff must show that "the defendant's actions violated a federal constitutional or statutory right" and that "the right was clearly established at the time of the defendant's unlawful conduct.").

The Court also finds without merit plaintiff's allegations that, had he not been retaliated against, he would have had his conviction vacated and been released before the COVID-19 outbreak began.  *See* Docket No. 34 at 7, ¶¶ 11–12.  This allegation is a conclusory opinion, as there is no indication that plaintiff's claims would have been successful, that he was actually innocent of the charges that he pled guilty to, that the Colorado courts would have acted quickly enough to release him before spring 2020. Plaintiff has not plausibly shown that his alleged injuries were caused by the CDOC defendants' actions.  *See Becker*, 494 F.3d at 925.

Finally, to the extent plaintiff believes that the CDOC defendants have tracked his movements in the library because he has submitted grievances, *see* Docket No. 34 at 6, ¶ 7, plaintiff has not shown that the CDOC defendants' action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to file grievances, and plaintiff appears not to have been deterred.  *See Becker*, 494 F.3d at 925.

### C.  Access to Courts

Plaintiff alleges that defendants' decision to alter the library access program provided unequal access to high- and low-security inmates and required mail-order library use, thus violating his right of access to the courts.  Docket No. 34 at 21,

¶¶ 86–88.[7]  Without physical access to the law library, plaintiff alleges that he was unable to adequately conduct legal research, obtain photocopies, access his previously drafted legal work, or file additional lawsuits.  *Id.*, ¶ 89.[8]

The magistrate judge recommends that plaintiff's access to courts claim be dismissed.  Docket No. 74 at 10–13.  The magistrate judge noted that it is well-established that prisoners have a constitutional right to access the court system; however, plaintiff failed to allege specific facts that demonstrate an actual injury regarding his ability to pursue a claim or defense.  *Id.* at 10.

The Court agrees.  The Constitution guarantees inmates the right to "adequate, effective, and meaningful" access to the courts.  *Bounds v. Smith*, 430 U.S. 817, 822 (1977); *Green v. Johnson*, 977 F.2d 1383, 1389 (10th Cir. 1992).  States may satisfy this duty "by providing prisoners with adequate law libraries or adequate assistance

---

[7] Plaintiff also alleges that the mail-order library use processes were counterproductive to mitigating the spread of COVID-19 because, instead of inmates visiting the library in masks and by housing cohort, librarians delivered materials to each housing unit, where masks were either not required or were less commonly worn.  *See, e.g.*, Docket No. 34 at 14, ¶¶ 45–49.  Plaintiff further alleges that the CDOC defendants allowed certain programs to continue, like the culinary program, based on whether the program was important to the defendants, not whether the program was safe.  *Id.* at 14–15, ¶¶ 50–51.  The Court has previously noted that just because an institution's COVID-19 mitigation steps are not the best possible response, the steps are not necessarily constitutionally deficient.  *See Grinis*, 459 F. Supp. 3d at 292.  Negligence alone is not sufficient for a constitutional violation.  *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

[8] Plaintiff alleges that he was unable to conduct adequate research in order to decide whether to accept a settlement offer in a separate case.  Docket No. 34 at 13, ¶ 43.  The Court will not consider this issue because access-to-courts claims may arise only in "attempts by inmates to pursue direct appeals from the convictions for which they were incarcerated," habeas petitions, or "'civil rights actions' – i.e., actions under 42 U.S.C. § 1983 to vindicate 'basic constitutional rights.'"  *Lewis v. Casey*, 518 U.S. 343, 354 (1996) (internal citations omitted).

from persons trained in the law." *Bounds*, 430 U.S. at 828.  Consistent with *Bounds*,

the Tenth Circuit imposes "affirmative obligations" on states to assure all inmates

access to the courts and assistance in the preparation and filing of legal papers.

*Ramos*, 639 F.2d at 583.  As mentioned previously, although the constitutional

obligation does not require states to afford inmates unlimited access to a library, *see*

*Twyman v. Crisp*, 584 F.2d 352, 358 (10th Cir. 1978), and there exists no rigid or static

formula to assess whether a prison library's resources pass constitutional muster,

*Petrick v. Maynard*, 11 F.3d 991, 994 (10th Cir. 1993) (citing *Johnson v. Moore*, 948

F.2d 517, 521 (9th Cir. 1991)), states must provide inmates with "a reasonably

adequate opportunity" to present their legal claims.   *Id.* (quoting *Bounds*, 430 U.S. at

825).  The law, however, does not require providing "inmates the wherewithal to

transform themselves into litigating engines capable of filing everything from

shareholder derivative actions to slip-and-fall claims"; rather, it requires that institutions

provide tools that "inmates need in order to attack their sentences, directly or

collaterally, and in order to challenge the conditions of their confinement." *Lewis*, 518

U.S. at 355.  "Impairment of any other litigating capacity is simply one of the incidental

(and perfectly constitutional) consequences of conviction and incarceration."  *Id.*

  An access-to-courts claim requires a plaintiff to "demonstrate that the alleged

shortcomings in the library or legal assistance program hindered his efforts to pursue a

legal claim," for example, that "a complaint he prepared was dismissed for failure to

satisfy some technical requirement which, because of deficiencies in the prison's legal

assistance facilities, he could not have known" or that "he had suffered arguably

actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." *Id.* at 351. This injury requirement "derives ultimately from the doctrine of standing." *Id.* at 349. Thus, "an inmate must satisfy the standing requirement of 'actual injury' by showing that the denial of legal resources hindered the prisoner's efforts to pursue a nonfrivolous claim." *Penrod*, 94 F.3d at 1403.  While a plaintiff need not fully establish that he would have prevailed, it is necessary that "the predicate claim be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Christopher v. Harbury*, 536 U.S. 403, 416 (2002).

Although plaintiff provides case numbers for current cases in Colorado state courts and alleges that he was unable to file seven additional lawsuits, the magistrate judge determined that plaintiff had failed to provide sufficient "supporting allegations or facts to demonstrate that these matters would qualify as nonfrivolous."  Docket No. 74 at 11.  Even assuming that his lawsuits were not frivolous, however, the magistrate judge concluded that plaintiff's complaint does not plausibly establish that his loss in the Colorado courts was attributable to the CDOC defendants' conduct or provide any details about the cases themselves.  *Id.* at 11–13 (citing *McBride v. Deer*, 240 F.3d 1287, 1290 (10th Cir. 2001) (where plaintiff "did not explain that his legal claim was nonfrivolous," actual injury was not sufficiently alleged)).  Plaintiff raises a series of objections to this determination.

First, he objects that the magistrate judge did not consider his argument that "the case requires a partial stay/abstention due to the rules of *Heck v. Humphrey* and

*Younger v. Harris*" and failed to "apply[] the proper legal standard of *Christopher v. Harbury* in determining whether [plaintiff] had described his habeas claims" well enough to apply the "nonfrivolous" test.  Docket No. 80 at 4 (citations omitted).  Plaintiff mentions *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Younger v. Harris*, 401 U.S. 37 (1971), in his complaint, *see* Docket No. 34 at 5, ¶ 1, but provides no argument for why either case is relevant to this matter, and they do not seem to be, given that both doctrines are typically invoked by defendants.[9]

Although plaintiff is proceeding *pro se* and the Court liberally construes his pleadings, the Court does not act as plaintiff's attorney and cannot construct arguments for him.  *See Hall*, 935 F.2d at 1110.  Moreover, the Tenth Circuit is clear that

---

[9] Under the doctrine of *Heck v. Humphrey*, a plaintiff may not maintain a § 1983 claim for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless the plaintiff can show that the "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . , or called into question by a federal court's issuance of a writ of habeas corpus."  512 U.S. at 486–87. However, if the plaintiff's claim, "even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed."  *Id.* at 487; *see also Martinez v. Caggiano*, No. 20-cv-00280-PAB-KMT, 2021 WL 915950, at *2 (D. Colo. Mar. 10, 2021).  Plaintiff has provided no argument or evidence indicating that his conviction was reversed, expunged, declared invalid, or called into question by a writ of habeas corpus.  In fact, plaintiff explains that he pled guilty to securities fraud.  Docket No. 34 at 18, ¶ 67.  Plaintiff has similarly failed to show the relevance of *Younger*. *Younger* abstention dictates "that federal courts not interfere with state court proceedings by granting equitable relief – such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings – when such relief could adequately be sought before the state court." *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999).  Thus, after *Younger*, "even when a federal court would otherwise have jurisdiction to grant declaratory or equitable relief, the court must abstain from exercising jurisdiction when a judgment on the claim would interfere with ongoing state criminal or civil proceedings."  *Cross River Bank v. Meade*, No. 17-cv-00832-PAB-KMT, 2018 WL 1427204, at *2 (D. Colo. Mar. 22, 2018) (citing *D.L. v. Unified Sch. Dist.*, 392 F.3d 1223, 1227–28 (10th Cir. 2004)).  Plaintiff fails to explain how *Younger* applies to this case.

"[a]rguments raised in a perfunctory manner . . . are waived."  *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002); *see also Murrell v. Shalala*, 43 F.3d 1388, 1390 n.2 (10th Cir. 1994); *Femedeer v. Haun*, 227 F.3d 1244, 1255 (10th Cir. 2000) (declining to consider argument where only a perfunctory reference to the issue was raised); *United States v. Kunzman*, 54 F.3d 1522, 1534 (10th Cir. 1995) (declining to consider issues that were nominally raised).

Plaintiff also argues that the magistrate judge did not apply the standard set forth in *Christopher v. Harbury*, *see* Docket No. 80 at 4, which, as the Court has explained, requires that a plaintiff's "claim [must] be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope."  *See Christopher*, 536 U.S. at 416.  The magistrate judge concluded that, because plaintiff provides "no facts concerning the underpinnings of [his] state cases, but instead merely cites to their case numbers and incorporates them by reference," his allegations were "insufficient to plausibly allege facts concerning those underlying causes of action in support of the access-to-courts claim," and the magistrate judge was unable to apply the test in *Christopher*.  Docket No. 74 at 11–13 (citing *McBride*, 240 F.3d at 1290 (an actual injury was not sufficiently alleged because, among other reasons, the plaintiff "did not explain that his legal claim was nonfrivolous").  In plaintiff's objection, he argues that he "did . . . outline every single fact that would establish his innocence *de facto* pursuant to *Harbury*."  Docket No. 80 at 4.  The sole description of his habeas claim – although it is not clear which particular habeas claim he refers to, as plaintiff has filed at least four petitions, *see* Docket No. 34 at 13, ¶ 43 – is his

description that his claim is "premised upon incontrovertible, prima facie evidence that cannot be rebutted."  *Id.* at 18, ¶ 67.  He states that

> [a]s a matter of law, the face of record [plaintiff] [pled] guilty to establishes: (1) [plaintiff] is not guilty of any criminal securities fraud offense, resulting from the unconstitutionality of criminal enforcement of § 11-51-501(1), C.R.S. (pursuant to § 11-51-603(1), C.R.S.) and § 11-51-201(17), C.R.S. overbreadth[;] (2) Brooks was NOT involved in the selling of securites [sic] and "if there is no security, there cannot be securites [sic] fraud" [;] and (3) the State of Colorado did not have jurisidiction [sic] to prosecute [plaintiff].

*Id.*  These allegations are conclusory.  They are not supported by any argument or factual allegations, and they do not establish that plaintiff's habeas claim is not frivolous.[10]

The Court also does not agree that the magistrate judge contradicted himself when he stated that he was "assuming the allegations regarding 2020SA385 create a plausible inference of a nonfrivolous claim," *see* Docket No. 74 at 11–12, and that he "acknowledg[ed] the nonfrivolous nature of [plaintiff's] claim."  *See* Docket No. 80 at 5. Rather, in the same sentence where the magistrate judge assumed, for the sake of argument, that plaintiff's allegations were not frivolous, the magistrate judge stated that "the Complaint does not plausibly establish [plaintiff's] loss of this state court case is attributable to the CDOC Defendants' alleged conduct."  Docket No. 74 at 11.

---

[10] In his objection, plaintiff cites to allegations contained in his first complaint, Docket No. 1, rather than allegations in his amended complaint, Docket No. 34, which is the operative pleading.  The Court declines to consider allegations made in an earlier version of plaintiff's complaint, *see Gilles v. United States*, 906 F.2d 1386, 1389 (10th Cir. 1990) ("a pleading that has been amended . . . supersedes the pleading it modifies") (internal quotation marks omitted); *Davis v. Bifani*, No. 07-cv-00122-MEH-BNB, 2007 WL 1216518 (D. Colo. Apr. 24, 2007); C. Wright & A. Miller, 5A *Fed. Prac. & Proc.* § 1326 ("an incorporation of material in an earlier complaint that has been characterized by the court as 'previously abandoned' . . . may prove confusing and inconvenient").

Plaintiff argues that his state habeas petitions were all dismissed on technicalities.  Docket No. 80 at 5.  He requests that the Court take judicial notice of two habeas petitions and states that he "incorporates and restates the motion by reference as though it was stated fully herein."  *Id.*  He concludes that the Court not having sufficient evidence to evaluate his claim or to plausibly state a claim is directly caused by defendants' obstruction and that the magistrate improperly "imput[ed] [defendants'] unconstitutional conduct onto [plaintiff]," which "proves that his access to the [c]ourts was obstructed *de facto*."  *Id.* at 5–6.  The Court, however, will not search plaintiff's habeas petitions for meritorious arguments or look for additional petitions not filed in this case.[11]  The Court is not plaintiff's advocate, *see Hall*, 935 F.2d at 1110, and the Court finds it inappropriate to incorporate each of these various petitions into plaintiff's complaint in this action to determine whether they are frivolous, *see Davis*, 2007 WL 1216518 ("[T]he Court does not believe that it is proper to incorporate by reference wholesale the allegations in a complaint in a completely separate action"), especially where plaintiff's complaint does not provide any factual support to show why he was entitled to relief that defendants allegedly prevented him from obtaining.

The only documents that plaintiff appears to have included with his complaint are a notice of deficiency from the Colorado Supreme Court for failure to provide a certificate of service with his filing and a subsequent order dismissing the case for

---

[11] Plaintiff states that defendants provided copies of each habeas motion that plaintiff filed in state court and the reasons each petition was denied.  *Id.* at 6 (citing Docket Nos. 17-2, 17-3).  Defendants, however, provide a list of 24 habeas petitions and appeals, *see* Docket No. 17-1, copies of four petitions, and five orders denying various petitions.  *See* Docket No. 17-3.

failure to cure the deficiency.  *See* Docket No. 34 at 31–32.  Plaintiff provides no allegations or description of his claims and arguments from that case other than a conclusory assertion that the court had a "full understanding that [plaintiff] is not guilty of any criminal offense" and that the Colorado Supreme Court declined to exercise original jurisdiction over plaintiff's direct-filed habeas petition.  *Id.* at 18–19, ¶ 70.  Moreover, the fact that his case was dismissed on a "technicality," *see* Docket No. 80 at 5, does not establish that the case was not frivolous.

Plaintiff also states that if he had access to a photocopier, he would have been able to correct the deficiency in that case, yet it does not appear that plaintiff was entirely without photocopying capabilities.  Rather, plaintiff alleges that the services were unreliable and not sufficiently confidential.  *See* Docket No. 34 at 8–9, ¶¶ 18–21.  Moreover, while it is true that an access-to-courts claim requires a plaintiff to demonstrate that the alleged shortcomings in the library "hindered his efforts to pursue a legal claim," for example, that a complaint was dismissed because of the plaintiff's "failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known," *see Lewis*, 518 U.S. at 351, failing to include a certificate of service is not a technical requirement that plaintiff would not have known about because of deficient facilities at Sterling.  Rather, plaintiff states that he is "proficient in drafting complaints," *see* Docket No. 34 at 17, ¶ 63, and has initiated numerous cases and filed many motions, presumably with certificates of service when necessary.

Plaintiff objects that the magistrate judge improperly "imput[ed] [defendants']

unconstitutional conduct onto [plaintiff]," which "proves that his access to the [c]ourts was obstructed *de facto*" and that his "being unable to submit evidence due to not having access to a photocopier has directly led to the [magistrate judge's] current ruling." Docket No. 80 at 5–6 (citation omitted). However, the fact that plaintiff had unreliable access to photocopying is not by itself a constitutional violation. The Tenth Circuit has made clear that the Court must review allegations that a facility's library is insufficient case-by-case. *See Petrick*, 11 F.3d at 994 n.3 ("Insofar as the inquiry under *Bounds* into the 'adequacy' of the state's library resources is necessarily fact specific, courts have addressed this question on a case-by-case basis." (citing *Ramos*, 639 F.2d at 584–85 (prison library's book collection is "'wholly inadequate' to meet the minimum standards of the American Association of Law Libraries Committee on Law Library Service to Prisoners"); *Johnson*, 948 F.2d at 521 (prison need not provide inmates with the best possible library and a library that lacked various titles of the United States Codes nevertheless met the constitutional standard); *DeMallory v. Cullen*, 855 F.2d 442, 446–48 (7th Cir. 1988) (prison provided inmate with constitutionally insufficient legal materials when it merely offered access to outdated versions of 1969 Wisconsin Statutes; availability of other volumes by precise citation only did not remedy the deficiency because inmates could identify precise citations only after referring to reporters, digests, or other "starter" materials); *Tyler v. Black*, 811 F.2d 424, 429–30 (8th Cir. 1987) (prison library was adequate given nearly complete set of federal and regional reporters, state statutes, rules, and digests)).

The case-by-case inquiry requires reviewing a plaintiff's allegations regarding a

facility's legal services "as a whole to ascertain its compliance with constitutional standards." *See Petrick*, 11 F.3d at 994 (citing *Bounds*, 430 U.S. at 832; *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) ("Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid.")).

Along with unreliable photocopying services, plaintiff complains that he had to conduct research by requesting precise case citations, which made it impossible to "shepardize" cases, conduct research to support his arguments, and understand legal principles. Docket No. 34 at 8, ¶¶ 16–17. He also alleges that lack of physical access to the library made it impossible to retrieve stored legal work or use a word processor, which prejudiced his ability to complete briefs within the length requirement. *Id.* at 8–9, ¶ 18–23. The Court finds that, notwithstanding these shortcomings, the magistrate judge was correct that plaintiff has failed to plausibly allege that he was denied access to the courts because plaintiff has not shown that he "was frustrated or impeded in his efforts to pursue a *nonfrivolous* legal claim concerning his conviction or his conditions of confinement." *Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010) (emphasis added).

In addition, "[a]ccess to the courts does not include a federally protected right to use a typewriter or to have one's pleadings typed, the reason being that pro se prisoners causes are not prejudiced by the filing of handwritten briefs." *Twyman*, 584 F.2d at 358. While plaintiff claims that, if he wrote his briefs by hand, he would have been unable to comply with the Court's rules on the length of a prisoner complaint, *see*

Docket No. 80 at 7, there is no such rule.  Moreover, the Constitution does not provide

an inmate a choice in the kinds of resources a law library must provide, and there is no

specific list of resources a library must have to "pass constitutional muster."  *Petrick*, 11

F.3d at 994; *Johnson*, 948 F.2d at 521.  Some impairment of plaintiff's "litigation

capacity" is "one of the incidental (and perfectly constitutional) consequences of

conviction and incarceration."  *See Lewis*, 518 U.S. at 355–60 (illiterate prisoners must

be given only the "minimal help necessary to file particular claims that they wish to

bring").

Moreover, the Court must determine "whether the prison's policy is reasonably

related to legitimate penological interests."  *Petrick*, 11 F.3d at 994 (citing *Turner v.

Safley*, 482 U.S. 78, 89–91 (1987) (articulating standard of review to scrutinize prison

regulation that impinges on inmates' constitutional right to marry); *O'Lone v. Estate of

Shabazz*, 482 U.S. 342, 348–49 (1987) (infringement of prisoners' constitutional rights

judged under "reasonableness" test); *Ramos*, 639 F.2d at 579 (same)).  "Because

*Turner* allows prohibitions and restrictions that are reasonably related to legitimate

penological interests," at the motion to dismiss stage, the Court considers whether the

plaintiff has "include[d] sufficient facts to indicate the plausibility that the actions of

which he complains were *not* reasonably related to legitimate penological interests."

*Gee*, 627 F.3d at 1187–88.  That is not to say that a plaintiff "must identify every

potential legitimate interest and plead against it."  *Id.* at 1188.  *Pro se* prisoners are not

required to "plead, exhaustively, in the negative in order to state a claim.  It is sufficient

that [a plaintiff] plead facts from which a plausible inference can be drawn that the

action was not reasonably related to a legitimate penological interest." *Id.* at 1188.

Penological interests that the Court considers include, among other things, financial

burden, whether there exist alternative means for the inmate to exercise the right,

whether there is a "valid" connection between the prison policy and putative

government interest, the "absence of ready alternatives" for the prison, and institutional

security and safety. *See Safley*, 482 U.S. at 89–91, 93; *Twyman*, 584 F.2d at 359

("Reasonable [prison law library time restrictions] are necessary to balance the rights of

prisoners with budgetary considerations.").

Finally, the impairment in this case, limited physical access to the law library,

appears to have been partially due to the COVID-19 pandemic and Sterling's attempt to

mitigate the spread of the virus, a legitimate penological interest.[12]  Plaintiff alleges that,

during his eleven years in custody, he routinely had more access to the law library but

that his access diminished during the pandemic.  That is understandable given capacity

restrictions and requirements to socially distance due to the pandemic beginning in

spring 2020.  While plaintiff may have had other suggestions that could have better

decreased the spread of the virus, the Court has explained that the fact that a facility's

efforts in response to COVID-19 were not the most effective does not amount to a

constitutional violation, and plaintiff has failed to plausibly allege that Sterling's

mitigation efforts, including limiting or ending physical access to the law library – but

---

[12] While plaintiff alleges that defendants were motivated to keep the library closed because they received hazard pay when Sterling was at the highest level of COVID-19 protocols, Docket No. 34 at 14, ¶ 49, the Court finds these allegations conclusory.  Plaintiff has not provided any factual support "from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest."  *See Gee*, 627 F.3d at 1188.

providing alternatives – were constitutionally infirm. *See Grinis*, 459 F. Supp. 3d at 292; *Perkins*, 165 F.3d at 811; *Petrick*, 11 F.3d at 994–95.[13]

Because the Court finds that plaintiff has failed to plausibly allege an access-to-courts claim, the CDOC defendants are entitled to qualified immunity. *See T.D.*, 868 F.3d at 1220 (a plaintiff must show that "the defendant's actions violated a federal constitutional or statutory right" and that "the right was clearly established at the time of the defendant's unlawful conduct.").

## IV. CONCLUSION

For the foregoing reason, it is

**ORDERED** that the Recommendation re: Motion to Dismiss [#40] [Docket No. 74] is **ACCEPTED**. It is further

**ORDERED** that Plaintiff's Objections to Magistrates' [sic] Recommendations re: Motion to Dismiss [#40] [Docket No. 80] is **OVERRULED**. It is further

---

[13] The Court's analysis does not change when considering the additional lawsuits that plaintiff alleges he was prevented from filing. These seven additional lawsuits allegedly address plaintiff's "conditions of confinement, including CDOC forcing [p]laintiff to wait 9 days for 'emergency' surgery to fix his broken jaw in November 2019, coupled with having a botched first surgery requiring correction and permanent disfigurement; community corrections boards violating [plaintiff's] due process rights; medical officials refusing to provide Plaintiff medical treatment; ongoing ADA violations rising to Eighth Amendment violations; additional retaliation claims stemming from [plaintiff's prior lawsuits; violations of due process for the State refusing to implement $3.3 million in restitution, which is curerntly [sic] says it may, or may not, impose at some distant future time and; violations of due process for [d]efendant Williams failing to provide inmates earned time for their exceptional conduct promoting the safety of fellow inmates, correctional staff, and their communities during this pandemic." Docket No. 34 at 16–17, ¶ 61. The minimal descriptions of these lawsuits do show that any of the cases or claims are nonfrivolous.

**ORDERED** that plaintiff's first and second claims for relief are **DISMISSED with prejudice**.

DATED: September 21, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge